My name is Lisa Piazzolo. With me is my colleague, Jeff Olshan. We represent the Individual Plaintiff Police Officers in this case and the Massachusetts Association of Minority Law Enforcement Officers. I would like to reserve five minutes for rebuttal if I may. Five minutes? All right. I hope you don't need it all. On remand, the police department bore the burden to show that the hair test at issue in this case, which had already been found to have a discriminatory impact on black police officers, was nevertheless permissible because it had been shown by professionally acceptable methods to be predictive of or substantially correlated with drug use. When it moved for summary judgment on this issue, the department took on an even heavier burden. It was required to present conclusive, and under this court's precedence, that means uncontradicted and unimpeached evidence of the validity of the hair test. The department did not come close to me in this case. When you say of the validity of the hair test, you mean that the hair test is significantly correlated with drug use and or predictive of substance abuse? That's correct, Your Honor. Okay. Yeah? In opposing the department's motion, the plaintiff police officers presented substantial, credible evidence that the hair test at issue in this case has not been shown by professionally acceptable standards to be a reliable indicator of drug use. Let me ask you about that because I'm having trouble understanding your argument on that. We have a test that is predicated to determine, as I understand it, whether someone has used cocaine within 60 days prior to the test. And it then takes this whole group of, say, 100 officers, and it separates out 98 who get a negative and two who get a positive. As I read the expert testimony, there's no claim here that the determination of those 98 negatives is not accurate. So it seems to me that you have a test that is hugely valid and accurate in terms of separating out, as compared to, for example, a coin flip where you get 50-50 and who knows which would be right. And therefore, you need to really focus on what alternative would achieve that same parsing out with that same degree of accuracy and yet not have the impact when it comes to the positive test results. Well, Your Honor, in the Abermurl and Griggs cases, in addressing the business necessity prong, Griggs, and this was endorsed in Abermurl, specifically stated that broad and generalized tests are not permissible or inadequate. The test must not just measure, provide general measurements. It must be focused on the qualifications of the person for the job. Well, it seems focused like a laser on the department doesn't want anyone on the force who was detected with using cocaine within 60 days prior to the test. And it's cleared 98% of the force. Virtually all the Caucasian officers and virtually all of the African Americans and Hispanic officers have been cleared by this test so the chief doesn't have to worry about them. But the Abermurl case also pointed out EEOC guidelines that says when a test has a racially discriminatory impact, which was the issue here, that separate validation ideally should be conducted because to the extent a test is valid with the majority population but is extremely invalid with respect to a minority population. So it's clearing 96, 97% of the minority population. Well, there was a dispute over the validity of the test for the minority population. There were issues about. Not on the false results. The focus was on. It's not on the negatives. Well, the focus was on the ability of the hair test with regard to the positive results to distinguish between whether those positive results were as a result of ingestion. But you can't close your eyes to the fact that the great majority of the results were negative results which no one has challenged. Everyone agrees the test is valid as to those. But as this court found in the first opinion in this case, the test had a discriminatory impact on black police officers. That's true. And your argument seems to me to be that because the test has a racially discriminatory aspect, it cannot qualify under the business necessity exception. And I don't think that's the law. I think if it meets the requirements of being significantly correlated and predictive and there are no equally valid alternatives, which is a different question which also has to be resolved on this appeal. It certainly can meet business necessity. The test under Albemarle is predictive of or substantially correlated by professionally accepted standards. Right. And in this case, the evidence that was presented by plaintiffs on summary judgment was that the FBI has suspended use of the hair test given research findings suggesting that cocaine may be absorbed into hair through external contamination. The Substance Abuse and Mental Health Services Administration has declined to use the hair test in its workplace drug testing guidelines. You've got all sorts of evidence that there are professional concerns and there's a professional dispute over the accuracy of the positive test results which are applicable to roughly 2% of the people who take it. Well, but if you want to die on this hill, then go ahead and continue defending it. But it seems to me once the city has shown that 98% of the results are unchallenged as accurate and your problem is that the 2% is disparately, which you have proven, allocated, to suggest that we're going to find the test not valid would be, I don't know of any other case that has found a test that has that high an accuracy rate to be invalid. But you've got some evidence, I think, that says you could get that same accuracy without having as many false positives that are disparately allocated. That is correct, Your Honor. On a summary judgment record, we've provided substantial evidence of less discriminatory alternatives. What is the alternative that you would like us to focus on as something that a jury could opt for in this case if given a chance to hear? An alternative is hair testing plus, which is essentially what the Massachusetts Civil Service Commission did when it made its findings in this case. It found that the hair test standing alone is insufficient to prove that under the civil service standard of just cause that an officer engaged in illicit drug use. It then went and looked at other evidence. Counsel, correct what may be a misapprehension on my part. I thought that the purpose of determining this issue was to determine whether or not, as a matter of business necessity, the police department could validly continue to use this test. Does this test, does this issue turn on the purposes for which the police department can then use the test results? Well, this issue turns on whether the test standing alone is sufficiently correlated with drug use. That's fine, but even if we answer that question yes, that isn't in any way an endorsement of the view that a positive test result, standing alone can be a sufficient cause for discharge. I understand that's what the police department wants to get to eventually, but I don't think that's part of the business necessity inquiry. Well, I was turning to the third prong of the test, which was the less discriminatory alternative. But the less discriminatory alternative that you propose, as I understand it, is to continue the hair test and then add to it the urinalysis as a further screening device. That was one of the alternatives that Dr. Kidwell had proposed. Yeah, but that's an alternative you mentioned in response to Judge Kayada. Yes, and we also have a hair test. But is that an alternative at all since it continues the hair test? The hair test would be used as one component, but not a conclusive component. And the case law under significant correlation, this is in the Clady case in the Ninth Circuit, and I believe the Second Circuit has said when the adverse impact is so great, as it is here, I mean, we have career police officers who have been on the police force for 25 years, 19 years, 13 years, on the basis of a single test were branded drug users and terminated from employment. On that single test alone, there wasn't a showing of significant correlation. We contend, but at least we provided evidence that adding precautions, urinalysis, different criteria on the hair test would be less discriminatory given the evidence that africoid hair, and there was substantial evidence in the record, is more susceptible to false positives from contamination. It has a higher melanin content, it's drier, it's subject to treatments, and so there was substantial evidence that urinalysis does not have that discriminatory impact in adding urinalysis. And what do you point us to in the record? There's this odd thing in the statute that basically suggests you not only have to show there was a less impactful, equally valid alternative, but that it was rejected or refused or not adopted by the defendant. Is there evidence in the record that this alternative was available at the time that is relevant to this lawsuit? Yes, Dr. Kidwell said that he informed, testified that he informed the police department of alternatives in 2003, and the police commissioner testified he was aware of the discriminatory impact of the test. The principal difference between what they were doing, in fact, the challenged practice, is they were automatically suspending and then terminating unless someone would go through the drug rehab program based on the hair test alone. Your alternative would postpone the discharge and forego, as I understand it, the drug rehab by proceeding upon a positive hair test to periodic random urinalyses, and only when one of those turned out to be positive would there then be further ramifications. That's correct, Your Honor, which would be appropriate particularly for a police officer who had been on the force for 25 years when you're trying to correlate the test to drug use as a police officer. What do we do with the dropping out of the drug rehab counseling? It's between the challenged practice and your alternative. The challenged practice has that, your alternative doesn't. Well, forcing an officer to go through rehabilitation when there, if it's a false positive, would still be discriminatory and it's still blaming someone. So you envision still the possibility of drug rehab counseling if one of the urinalyses turned up positive? Yes, Your Honor. Our main concern is the termination without recourse to provide any response to the finding of presence of cocaine in hair. I mean, some of these officers had no indication of any job impairment resulting from drug use after a long time on the force. And the alternative would meet the needs of the police department in screening out officers whose duties would be impaired by drug use while protecting against a test that has discriminatory impact, we believe has been rejected as a viable workplace test by the Department of Justice. The Department of Defense, their chief toxicologist rejected this test for use in the Department of Defense. There is no reason, and plaintiffs certainly provided evidence that a reasonable alternative, less discriminatory alternative for the Boston police force is hair testing plus urinalysis. When the hair test has been so resoundingly rejected, we do believe there was substantial evidence also on the business necessity issue on a summary judgment record. I would like to return to Judge Selye's question and follow up on that, if I might. The district court seemed to suggest that if you were providing an alternative, suggesting an alternative to the hair test, it might be appropriate, as we said in our prior opinion, to require extensive or statistical data to support the efficacy of that test. Your point, I take it here, is that where you keep the hair test in place and then add a plus to it, that wouldn't be necessary. Because the plus that's added here was admitted by all experts in the case to eliminate the discriminatory impact. And that's what gives you the material dispute effect, sufficient evidence to create the material dispute. It certainly gives sufficient evidence that by adding that less discriminatory testing methodology, you at least mitigate the problems with Africoid hair and racial bias in the hair test. And this is, just to repeat myself, this is why you think that the standard of extensive or statistical support is not necessary in this case because it's admitted that it's a better process. Because it's certainly a factual dispute that a reasonable fact finder could find without statistical evidence that adding your analysis to the hair test would be less discriminatory. But I thought your basis for saying that is that it was admitted. That's correct. Oh, okay. Well, or at least dispute. There is certainly evidence to support, and I believe most of the experts admitted, that your analysis does not have the racial bias concerns that hair testing does. Well, the testament was it didn't have a mechanism that was associated with differentials in anatomy, but it did, a lot of the evidence did show you still had a disparate impact from it, just a lot less than what we have here. That's correct. And in response to Judge Howard's question, our test did not always require statistical evidence on the third prong if something was by its very nature less impactful. We do not. I'm aware of that language in the court's opinion. We did not interpret that as a requirement in all cases that to show a less discriminatory alternative extensive statistics would be required. Okay. Thank you. Thank you, Ron. Good afternoon, Your Honor. My name is Helen Wetzel. I have the honor and privilege of representing the Boston Police Department, the Commissioner, and the City of Boston in this matter. To close the loop on this line of argument, let me clarify a couple points. One, my sister counsel has stated that Dr. Kidwell, their expert, informed or presented the Boston Police Department with evidence of this alleged alternative practice of hair testing plus. That is incorrect. There is nothing in the record, and as Judge Woodrock found, there is no evidence in the record that Dr. Kidwell presented this hair testing plus to the Boston Police Department during the relevant time period between 1999 and 2006. In fact, Judge Woodrock in his opinion stated that the plaintiffs in fact make no allegation that this alternative was presented to the Boston Police Department, number one, and the Boston Police Department refused this alternative. Let me ask you about that. In fact, the Boston Police Department isn't the challenge practice here, hair testing plus. The only difference is that under the challenge practice, the adverse employment ramifications are visited upon the officer before the urinalysis shows up positive, where under what the department did, you would get a positive hair test result. You would then have a 45-day suspension. You would then go into the drug rehab and have urinalysis tests on a random basis. So you were doing hair testing plus. The only distinction is when you visit the adverse employment results on the positive test. Yes. Our policy is very generous. It's actually, in fact, one of the most generous in the country to allow officers the opportunity to rehabilitate. So the way that the policy was instituted and it was, as your honors are aware, it was the result of extensive negotiation. It was not unilaterally imposed by the Boston Police Department as a policy. It was extensively negotiated with the union. But what difference does that make? Historically, unions have, I'm not pointing to any particular union or any union now, but if we look back through history, we see lots of examples where unions themselves were hand-in-hand with employers on employment discrimination. Certainly, if in Griggs Power, the Duke Union had agreed to the test, the Supreme Court wouldn't have reached a different result. So isn't that kind of neither here nor there? I don't want to go back to whether this alternative that they proposed was available, was known to your department, and would have had equally valid results and yet less impactful. Well, the fact that it was union negotiated is an important point and relevant as the Supreme Court stated in Ricci di Stefano because there's a rational presumption that the policy in place or the employment practice in place served a legitimate and significant purpose for the employer. But if we're talking about prong three, you've already won that. That's true, Your Honor. I understand. So on prong three, what does any of this with the union have to do with anything? Aren't we just looking at whether there was an available alternative practice which would have equally or better furthered your client's business needs and yet would have had less disparate impact in achieving that same result? That's right. That is the analysis. What the plaintiffs have failed to do here is establish that, establish the evidence that is required to make the determination that, in fact, this alternative was presented to the police department and was refused by the police department. There is no evidence here that it was presented to the police department. But they have to present to an employer a practice that the employer already knows about? And as has already been pointed out, the police department clearly recognized the value of your analysis because they were using it as part of their rehabilitation program. Yes, Your Honor. What is different here is that it's not the same. What the plaintiffs are presenting is not the same policy and procedure that the department has instituted. The plaintiffs are proposing that it would be a more palatable alternative merely to move the pieces around and you'd get better results and you would reduce the discriminatory impact. But the pieces that they propose to move around are all pieces that are well known to the department and were, in fact, being used by the department in its testing. But not in the sequence that they have presented here. And what the plaintiffs have the burden to do on prong three is to reduce evidence that, in fact, it is, in fact, a lesser discriminatory alternative. It's equally valid and they simply did not satisfy that requirement here. We don't have any evidence here of what hair testing plus with the hair analysis, what those results would have produced when compared to the results with just hair testing alone. But it had to be an improvement over here, testing alone, or else the department wouldn't have incorporated it into its rehabilitation program. I disagree, Your Honor, and that is an assumption that is being made that is not borne out by the evidence in the record. So we can't assume that the department wouldn't have incorporated your analysis if it didn't believe that your analysis had a useful function? Your analysis does have a useful function, Your Honor, but that is not the analytical rubric in which we evaluate lesser discriminatory alternative. Your analysis only provides a window of detection on 48 hours. It does not provide the 60- to 90-day window of detection that hair testing does. Well, I'll build on that because it seems to me that your analysis, random urinalysis tests done periodically throughout a year are going to be a lot more detective than what your client was doing. As I understand it, your client was doing schedule your hair test within 30 or 60 days of your birthday. And so someone just needed to know that they had to stay off it for 60 days. That won't work with urinalysis because they don't know when the test will come. I also keep coming back to, we're on, this is a summary judgment ruling, right? That's correct, Your Honor. So there's been competent expert testimony that there is a biological mechanism that is disparately correlated with the races, and that there's expert testimony that your client's test techniques could not fully discriminate between ingestion and exposure. And there's been expert testimony that urinalysis tests don't suffer from what those experts say is a problem. Don't we have to assume at this stage that each piece of that expert testimony, which was not subject to any Dalbert challenge, is believed by the jury and is correct? And given that, isn't it much better for the department to have something that reduces the likelihood that it takes a good-performing, non-drug-ingesting individual in fires? Isn't it better to keep those people on the force so you're actually furthering your client's own business objectives? The question, though, before us is not whether it's a better, whether conceivably in theory it is a better alternative. The question here before you is whether the plaintiffs do sufficient evidence to establish at the very minimum a question of fact on that. And here what Judge Winlock determined is that they did not meet that burden. We can engage in a theoretical discussion of whether it is more viable or not, but that's exactly what it is. But if you believe the testimony on hair testing from the plaintiff's expert and you believe the testimony from all the experts on urinalysis, then doesn't it follow that a jury could infer that the results of the hair plus urinalysis testing would completely replicate the same results in terms of negatives? In other words, it would clear the same 98 percent, and then as among the 2 percent it would capture a slightly smaller number because it wouldn't have the race-based aspect of it. And a jury could reason, therefore, that's going to be less impactful by arithmetic. So you're making the assumption that the expert testimony on whether urinalysis is a lesser discriminatory alternative is the only aspect of the analysis on front three. That is not the only aspect. Both the testimony on the hair test and the testimony on urinalysis seems to suggest to me, and I would think it would suggest to a reasonable juror, that we're likely to get slightly different results here in one direction. Maybe the juror would be wrong, but isn't that the reason we have to draw inferences and decide which experts are credible? I think that our job on summary judgment is to determine whether the evidence is sufficient for the jury to conclude that, and I would disagree that the evidence is insufficient for the jury to make that conclusion. What piece of evidence would the jury be missing in urinalysis? Well, I think what would be missing is an explanation from the experts that the combination of hair analysis and urinalysis in a particular structure is going to create a lesser impact. There's no statistical evidence that has been produced by the plaintiffs' experts that the hair testing plus So that goes to my question. It seemed to me that Judge Woodlock applied what was suggested as a possibility in our opinion, and that is extensive or statistical data, and we've established this morning that that's not required in all cases. So can't we just stop there and say that the judge applied the wrong standard? Are you referring to Judge Woodlock? Yes. My understanding of this Court's opinion was that extensive data and statistical evidence needed to be required in order to satisfy the third prong, particularly where there is a large sample, as in this case, and the adverse impact is small. What language in our opinion are you pointing to? What precisely does it say? Because I don't think it says that. I think it says, isn't there an or or an exception? That's right, Your Honor. It does say that unless it's self-evidently Exactly. And here I would disagree that it's self-evidently demonstrated because we don't have any analysis, particularly with what the hair testing plus with your analysis results would produce compared to hair testing alone. But it would have to be better, wouldn't it? But that's an assumption we're making. We're not making any assumption at all. There's no evidence, nothing that even suggests that doing a follow-up urinalysis is going to alter or change in any way the results of the hair testing. So you start with the hair testing, which, for the sake of argument, will say clears 98 percent, so we're left with the 2 percent. They get the same result out of the hair testing. All that the urinalysis can do is clear people within that 2 percent. It's not going to affect at all people in the 98 percent because they're going to be judged by the hair test results. So this is a one-way ratchet. Adding urinalysis can only help to make the result more precise and less racially discriminatory. That's all it can do. You seem to want some kind of precise measurement as to how much of a difference it will make, and that may be arguable. I don't see the fact that it can and will make any difference of some extent as arguable at all. But what I'm arguing, Your Honor, is that it's the plaintiff's burden to demonstrate that hair testing plus with hair analysis is going to produce a lesser disparate impact and is equally as effective and cost-beneficial to the department's procedure of just hair testing alone. What we have here is evidence in the record that demonstrates that urinalysis, in fact, is easy to adulterate, is easy to dilute. It has lesser sensitivity than hair sample analysis, and there's no dispute in the record about the less effective nature of urinalysis. It's effective enough that the department uses it in its rehab procedures. If urinalysis was some sort of discredited procedure that the department had eschewed because of all of the faults that you now eliminate, that argument might have some force, but urinalysis has the imprimatur of the department itself because it's a stanchion of its rehabilitation program for suspected drug users. It is an important component of our hair testing regime, but it is only used after the hair testing positive is demonstrated as positive. But that's the way it would be used in the hair test plus scenario. But it's also missing, Your Honor, however, if you assume that that's correct, that the plaintiffs were still under the burden of establishing that it's equally as effective and that it is as cost-effective as hair testing alone. And here we have no evidence of that. Judge Whitlock found there is no allegation that hair testing plus urinalysis is going to be as cost-effective as hair analysis on its own. We don't have any evidence whatsoever. They presented no data of cost, no calculations, nor any evidence of what the burden will be on the department to impose that in the sequence that the plaintiffs are now presenting. Judge Whitlock found that that is exactly correct. Excuse me. Can you clear up a confusion that I have? If the system that was in place put the officers who tested positive on the hair test alone into this next set of you're going to undergo urinalysis, how could doing the same thing, only doing it before you put them into another process, cost more? Because what's going to happen, Your Honor, is instead of just having hair testing alone where an officer goes in, conducts the hair test, and then gets a result either positive or negative, what is being proposed here? We're only concerned about the positive, right? Yes, the positive. So then what we're having is positive and negative, excuse me, positive hair tests and then a urinalysis test being conducted at the same time. Is anyone saying at the same time? I thought the hair test plus was do the hair test, if you get a positive result, before you take any action against the officer, do your analysis. You may do it at the same time, you may do it a day later, you may do it. The key is do it before you move against the officer. How could that be more costly than the prior system? Well, the question is we don't have evidence of that, Your Honor. No, it's just a matter of logic. But the plaintiffs have the burden of presenting that evidence. They put together nothing here. Plaintiffs don't have the burden of presenting evidence of things that are self apparent. If this case turned on whether the sun was likely to come up tomorrow morning, would we need evidence in the record for that? No, that's what I said. I mean there are some things that follow from common sense. Yes. So your analysis would actually, your analysis applied only to those who register positive on the hair test would obviously serve as a mechanism to some extent to screen out further any false positives. We can argue about the degree to which that screening would be effective, but I don't think it's even arguable that it would be effective to some degree. And yes, you make a technical point about additional cost, but as the Chief Judge pointed out, that's a cost which you've shown a willingness to absorb anyway through the rehabilitation program that you've constructed. I understand your point, Your Honor. Again, though, it is still, we are operating still in a vacuum because we still don't have the evidence that indeed hair testing plus a combination of the hair test with your analysis would indeed produce a lesser discriminatory result than hair testing alone. It is not the Department's burden, but in fact the plaintiff's burden. And beyond that, we still don't have any evidence that the plaintiff's presented this proposal to the Department and second, that the Department refused this proposal. There is no allegation there. Suppose the Department was firing police officers based on how dark their skin was. Okay, that was the test. And a proposed alternative was that you don't look at the color of skin, you look at something else like their performance review. Would we actually need statistical evidence to suggest that that latter would most likely be, produce a lesser race-based disparate impact than the former? I think not. I think it would be like the sun coming up. And so if you believe your experts, then what you're saying is completely right. But if the jury believes their experts, isn't it just like my example, which is if you believe their experts, they're using a factor, in other words, the ability of the cuticles to absorb cocaine through exposure rather than ingestion that's race-correlated, and they propose moving to a confirmatory test, your analysis, that has no race correlation. But then what we're going back to is the argument that somehow there's a risk of a false positive or a risk of external contamination. And their own experts agreed that 83 to 97 percent of external contamination has been removed. There's no requirement that the test be perfect. No, but if you're in that other 10 percent, the officer in that other 10 percent, that's a small comfort here. But under Title VII, a 100 percent standard of perfection is not required. All that is required is that an establishment of significant correlation be established between the test itself and the goal that it seeks to achieve. And here we've established that, as Judge Woodlock established, what they're imposing is a possibly high standard of correlation that is not required under Title VII. Thank you, Your Honor. Thank you. I'd just like to follow up on the evidence in the record on the suggestion of the alternative methodology. The evidence is at A1815, and it's Dr. Kidwell's June 2003 declaration. And also at A271, a plaintiff's factual allegation that as early as 2003, Dr. Kidwell suggested alternative methods for ensuring a drug-free workforce. I would also like to... Suggested to whom? To the Boston Police Department. That's what the record says? Well, the record is his declaration that's dated June 2003. And it's stated that he made those suggestions to the Boston Police Department? That is not stated in the declaration. Well, but that's rather important, isn't it? Pardon me? That's rather important for purposes of the issue that we're considering. Well, the declaration was signed in 2003. So as early as 2003, the factual allegation is the Boston Police Department knew of Dr. Kidwell's suggestion for the alternative, less discriminatory hair test. And when you say the factual allegation is, how is that factual allegation supported in the record? Is that in an affidavit of someone? Or is it merely an allegation of counsel? Well, the declaration, I believe, was submitted in this case. I understand that Dr. Kidwell made a declaration. But then you make what you describe as a factual allegation that the suggestions made in his declaration were made to the police department. The declaration just speaks to the alternatives. It does not contain a statement. The factual allegation that you described and you give us an appendix citation for, what's the source of that factual allegation? Is that there's a difference? If it's someone's affidavit, that's highly relevant. If it's merely an allegation of counsel or a statement made in a pleading, that's considerably less relevant. The declaration, the bystander... I understand about the declaration. I'm saying the factual allegation that this was suggested to the BPD. Why don't you tell us who the doctor worked for in 2003? Well, the declaration was submitted, I believe, in connection with the case. So the allegation is that the department was a party to this case and therefore knew of Dr. Kidwell's suggestions as early as the date of his declaration. So when you say it's a declaration, it's not just a declaration floating out there in the ether. It's a declaration that was served on counsel for the city. Okay. I believe that is correct. What is the document at A271? That is plaintiff's facts on summary judgment, plaintiff's factual allegations on summary judgment. And that simply cites to the declaration to answer Judge Selya's question. So A271 has no independent basis? Not additional to the declaration of Dr. Kidwell himself. Would any of the plaintiffs terminate it after the date of that declaration, after the declaration was served? I do not know the answer to that question. Then what are we to do with respect to those who were terminated prior to 2003, since there were some since the case was already going? Well, on that point, the record evidence is that Police Commissioner Evans testified that he knew of the discriminatory impact of the hair test and he met with Mammaleo to discuss the discriminatory impact. I think that the record is less clear on what may have been said in those meetings, but we think on summary judgment, there is sufficient showing that the problems with the discriminatory hair test were brought to the attention of the police department. With respect, that begs the question, with respect to people fired before service of the Tidwell Declaration, what evidence is there in the record that the BPD was aware of alternatives to the hair test? So we understand that two of the plaintiffs were fired. I didn't ask what you wanted to understand. I asked what evidence there was in the record. Well, two plaintiffs were fired in 2004, so that was after Dr. Kidwell. But you obviously would like to keep this case alive as for all the plaintiffs. I'm not aware of anything other than the Declaration itself. Well, aren't you aware of the fact that the City of Boston was using your analysis as part of its test? Pardon me? Prior to 2003, wasn't the City using your analysis as part of its regiment? I believe so, Your Honor. Yes. Thank you both. Thank you.